Memorandum of Decision
(as to the father only)
This is an action for the termination of parental rights of Emily K. and Jorge L., the biological parents of the minor children Michael, born June 27, 1991, Susana, August 5, 1992, and CT Page 11148 Jose, born March 28, 1994. These children have previously been found to be neglected children on January 10, 1997 (McLachlan, J.). The children have been in foster care since February 2, 1996. The petition was filed by the Commissioner of the Department of Children and Families ("DCF") on March 17, 1998.
The father of these children is now and will continue to be incarcerated in the Commonwealth of Pennsylvania for a number of years into the future.[2] The respondent father has been served with the petition and had written to the clerk of the court asking to participate in these proceedings. He has court-appointed Connecticut counsel. He and his attorney were willing to participate in the trial via video conferencing or telephone conferencing, a procedure which comports with due process according to the Connecticut Supreme Court. In ReJuvenile Appeal 187 Conn. 431, 437 (1982)[3] This court has utilized this procedure with success for incarcerated respondents in California, Florida, New York and New Jersey. Efforts by the judges and staff of the Child Protection Session of the Connecticut Superior Court over the course of four months, to secure the cooperation of the Department of Corrections in Pennsylvania in order to establish a video conferencing trial for the imprisoned father initially failed. As a consequence, the termination of parental rights trial here in Connecticut was bifurcated to allow for a trial as to the mother and the father beginning on January 25, 1999. The portion of the trial regarding the mother concluded on January 26, 1999. A written decision was filed on February 2, 1999, terminating the biological mother's parental rights. The father's case was continued to allow his counsel to review the testimony with his incarcerated client.
Subsequent to that trial, transcripts were prepared at the expense of the Judicial Branch of the State of Connecticut. The transcripts were translated into the Spanish language. Counsel for the respondent father was permitted to travel to the Commonwealth of Pennsylvania to review the evidence and to prepare the respondent for his portion of the trial of this case. The respondent-father was authorized to recall any witnesses and to present any witnesses he wished. The second part of the trial of the case regarding the father only, resumed on August 5, 1999, by telephonic communication between the respondent in a Pennsylvania Correctional Facility and the trial court in Middletown, Connecticut. Counsel for the respondent-father elected to have his client testify by phone. A Spanish-speaking court interpreter translated the questions and the answers. The CT Page 11149 respondent testified himself and his attorney re-called one DCF social worker for re-examination. The respondent thereafter rested. The petitioner presented no rebuttal.
The court finds that there is no proceeding pending in any other court effecting the custody of the children. The court has previously heard from a DCF social worker and a licensed clinical social worker-psychotherapist for the children, the maternal grandparents from Pennsylvania, foster parents, Saul J. Karpen, an assistant professor of pediatrics and specialist in gastroenterology and hepatology from the Yale-New Haven Hospital, a permanency planning social worker and the respondent mother. All their testimony was transcribed and translated into Spanish. The court received into evidence social studies, court approved expectations signed by the parents, arrest and conviction records, a psychological evaluation and letters from service providers and therapists.
The court previously made findings by clear and convincing evidence which are incorporated into this decision and any variance to the prior findings predicated upon the respondent-father's evidence is noted.
The sociological history of the parents was presented in the form of testimony of the social workers, psychological evaluations and the social study. (Exhibit # 22). This social history was essentially unchallenged by either of the parents or their counsel. The respondent-father did dispute certain statements made by the children's mother.
This is a case essentially arising out of the Commonwealth of Pennsylvania. The mother, Emily was born and raised in Pennsylvania and currently resides there. One example of her poor judgement was to associate with a man that later came to be the father of these children. Jorge Hiram L., the children's putative father, is presently incarcerated in the State Correctional Institution at Cresson, Pennsylvania.
Emily was raised in Pennsylvania and attended local schools until she quit after the ninth grade. She is the third of three children of an extremely dysfunctional marriage. One sister is retarded and in placement in a state home in Pennsylvania. She describes her childhood as abusive. She reports that her father was an alcoholic and drug addict who sexually abused her. (Petitioner's Exhibit # 10) "She witnessed many scenes of CT Page 11150 violence between her mother and her mother's boyfriend and experienced physical abuse herself from him. She moved out without completing high school. Emily reported to a psychologist that she had a previous psychiatric history at age 10 or 11 years where she saw a psychiatrist once a week. (Exhibit # 19) She reports using alcohol at age 15, marijuana and cocaine at 18 and smoking crack cocaine at age 21. She lived with various friends until she met Jorge when she was 18 years old. She became pregnant by him. They never married.
Jorge was a drug dealer according to Emily. In his August 5, 1999 telephonic testimony, Jorge denied that. Emily began the casual intranasal use of cocaine that Jorge made available to her. She used it on week-ends and denies using cocaine during her pregnancies[4]. While living in Erie and while she was pregnant, she and Jorge and another couple were arrested after they left a K-Mart department store with a shopping cart filled with three hundred dollars worth of merchandise. They were all charged with conspiracy to commit retail theft, according to Emily's testimony. The other couple involved in the shoplifting were discharged from the criminal proceedings by receiving two years of probation. Emily says that Jorge got six months in jail for this crime and did serve some time in prison. She says that she was awaiting the birth of her first child before she was to be sentenced. Jorge completed his jail time. He was still on probation or parole when he was arrested again on a serious drug charge. Jorge did not wait around for a hearing on his violation of probation or on the new criminal arrest.
Jorge knew he would have to go back to jail. He convinced Emily that since their first child, Michael, had now been born on June 27, 1991, that the court was now very likely going to sentence her to jail. She cried as she recalled that she did not want to go to prison and leave her baby. Her understanding was that "Judge Connelly told me I was going to get a maximum of twelve years," likely an advisement of the maximum possible sentence for the crime. Jorge told her to leave with him immediately for Puerto Rico. She did. They became fugitives from justice.
She remained with Jorge in Puerto Rico for two years. Since she was unable to speak Spanish and had no support network, she testified that she was unable to get drugs while in Puerto Rico. Homesick, Emily left Jorge and returned with young Michael and the infant, Susana, to live with Jorge's niece in Waterbury, CT. CT Page 11151 Soon, Jorge left Puerto Rico and also came to Connecticut to resume living with Emily. It is not clear what life was like in the home; what kind of parenting occurred; what kind of stimulation and nurturing the children saw or didn't see. Some things did emerge from the testimony at trial. The children developed horrific emotional demons while living with Jorge and Emily and were chronically neglected.
These children did not have a stable physical environment, moving frequently from friend to family, apartment to apartment, state to state. The children did not have the stimulation, nurturance and affection of mature, pair-bonded parents. For these children, the pregnancies were not planned, and for Jose, not wanted. For these children the teen-age mother had not completed high school, she was low-functioning intellectually and vocationally,[5] she was not married and estranged from her dysfunctional family of origin. No abiding religious or moral values appeared to be present. Both of the children's parents were abusing illegal drugs, tobacco and/or alcohol during the time the children resided with them. Using illegal drugs and alcohol on a daily basis impairs judgment and creates conditions that foster child neglect. At the very least, supervision is reduced and inappropriate decisions are made. As is apparent from the condition the children were in when they entered foster care, these children were physically, medically and emotionally neglected by both of their parents.
The mother does report that she did alter her substance abuse habits as an accommodation to her pregnancies. She reports to six pregnancies, three terminating in miscarriages or abortion (Exhibit # 7) She does not report adequate pre-natal care for herself or her unborn children. this in itself constitutes medical neglect. All live births were born medically fragile and impaired[6]. The mother was herself poorly parented and she was overwhelmed by the neediness of the children. The mother reports the father of the children was controlling, jealous, unhelpful, physically abusive and sexually demanding of her. She reports that he threatened to turn her in as a fugitive from justice if she denied him sex. She reports that Jose's pregnancy was unwanted and resulted from Jorge's threats and sexual demands. She reports to frequent calls to the police whom, she claimed, would not assist her.
Emily further reported that Jorge has a total of thirteen children from various maternities and that he does not support or CT Page 11152 care for any of these children. In his telephonic testimony, Jorge was able to name seven other children by name. He denies he has thirteen. With the three children born to Emily, Jorge concedes to having ten children. Emily testified that she met Jorge's ex-wife and that both the former wife and Jorge were criminally involved and on probation. These three children of Emily and Jorge were born into a situation at high risk for abuse and neglect.
For Jorge, the use of the word "father" is clearly a euphemism. Jorge fits the classical portrait of a neglectful male parent. That profile contains many of the following attributes. The father is frequently: a) uncertain of his paternity and not married to the children's mother, b) incarcerated, c) substance impaired, d) criminally active, e) psychiatrically impaired, f) under-educated (often, uneducable), g) occupationally below community standards, and/or h) low-functioning. The presence of these conditions are risk factors for abusive and neglectful male parents.
In this case, Jorge presents many of these risk factors. He is the second youngest of sixteen children. He was born in Puerto Rico, attended school for nine years and moved to Pennsylvania when he was fourteen. He reports to unskilled labor in a juice factory and a meat factory. In Puerto Rico he and Emily worked as orange and coffee pickers. Jorge, is a self-described poly-substance abuser who, not surprisingly, fell down at a factory job, injured a kidney and has been collecting Social Security every since.[7] He is a native Spanish speaker with low functioning in the English speaking world around him. His lack of formal education, lack of vocational or technical training, and poor knowledge of the English language, make him a poor candidate for anything above entry level unskilled labor. His injury or disability further disqualify Jorge from many jobs. His childhood background of dropping out of school and early abuse of alcohol suggest a compromised dysfunctional family. It is unlikely that Jorge had good parental role-models. There is nothing in his background which is encouraging of his prospects as a parent. Especially to children who need exceptional parenting skills.
Jorge did not involve himself in the household chores. He was not willing to ease the maternal burden, according to Emily. It is was not his obligation to see that Michael went to school, even though he was at home and Emily had gone to a DCF directed CT Page 11153 service program. The early records show Michael, the oldest child, to be chronically absent from school to the point of severe educational neglect. Despite her continued occasional use of drugs herself, Emily did try to follow some of the recommendations of the early DCF service providers. She also, on her own, not at the request of DCF, obtained employment as a waitress at a pizzeria. She worked from 10:30 AM. until 5:30 PM. If the next shift waitress didn't show up, Emily worked until midnight. The children were left with Jorge and his colleagues.
Emily said "The guy don't do nothing." He would not help her with the care of the children. Jorge's interest was drugs, according to Emily. He only rarely used his social security assistance to pay the rent. When things were desperate, Jorge would sell household goods to get money for drugs. Emily testified that on one occasion she took her youngest, sickest child to the hospital for a check-up. When she returned home Jorge had sold the child's "breathing-machine" to get money for drugs. On another occasion he sold a child's snowsuit, Emily said.
According to Jorge's telephonic testimony, he did take care of the children and feed them and bathe them, ". . . but I know cleaning should be done by a woman." His plan is to continue in prison to learn to read and write. He says he has a house in Puerto Rico and that when he gets out, he intends to take the children to Puerto Rico. Under examination he is content to let Jose live in his present home given his chronic and life-threatening medical condition.
The early referrals to DCF began to occur in May, 1995. Michael was almost four, Susana was two and a half, and Jose was one. Jose had been born with a condition known as biliary atresia. It is a severe, life-threatening chronic, progressive liver disease (Petitioner's Exhibit # 5) which requires frequent hospitalizations. He requires a liver transplant within the near future. He spent the greater part of the first year of his life at the Yale-New Haven Hospital. He required surgery and after the surgery Jose had frequent serious infections. The pediatric gastroenterologist and hepatolgist who testified in court said that Jose was receiving substandard care at home and was poorly nourished. Jose and his mother, at times, missed visits for medical care. As a result of Jose's frequent hospitalizations, where he no doubt was stimulated and nurtured by the nursing staff, and his subsequent removal from the parents at about age CT Page 11154 one, Jose was the least emotionally damaged of the three children.
Seven referrals to DCF were made in 1995. DCF investigated and placed "wrap-around" services in place to support the family in the home. The referrals to DCF were made by neighbors and the service providers. These referrals involved allegations of drug abuse by both parents, educational neglect, non-compliance with the services, domestic violence and overall neglect. (See Affidavit of Marci Craft, appended to original neglect petition).
The family received $1800 per month from SSI, SSA, AFDC, and food stamps, yet there was inadequate food in the home and mother resisted requests of service providers to get a telephone so they could reach her and she could contact medical care providers regarding Jose's condition. The affidavit of the social worker is replete with documented observations of neglectful care of the children, Susana wandering in the street, Jose with inadequate clothing and dirty, soiled diapers, rashes on the children, infectious sores, poor attendance at school and preschool, and missed medical visits. When asked about these problems "[Emily] . . . laughed and said `I don't know, its hard for me'."
One of the things that made life physically and financially stressful for Emily was that both she and Jorge were "doing drugs." Emily tested positive for cocaine at the Joseph Center where she had been referred. She was accepted in to their out-patient program for substance abusers, but was unsuccessfully discharged from the program on Jan 2, 1996 for failure to comply. She again tested positive at the Morris Foundation, another service provider on January 22, 1996. Again she was accepted for treatment and failed to attend. Jorge, at all times relevant, was largely unavailable for services offered by DCF. He went to one program for a short time before his re-arrest. He tested positive for cocaine at the in-take evaluation.
On February 2, 1996, the DCF worker visited the home. There was no food, the children were filthy and neither parent had been compliant with the various service providers. A decision was made to remove the children. Michael announced that he was "happy to go." He described being hit by his parents and the babysitter, Wendy. Michael told the social worker that he and Susana and Jose had been hit "again, again and again."
The three children were brought to a foster home where Jose CT Page 11155 remains to this date. The older two children have been moved several times since this early placement. The physician from Yale-New Haven described this foster home as "excellent and loving."
When the children initially arrived in foster care Jose had a bottle filled with sour milk. His clothes were too small. His diaper was filled with feces and urine and he had a severe diaper rash on his buttocks and inner thighs "to the point of near bleeding." Susana, who urinated in her pants and on to the floor, was found to have a diaper-type rash as well and had no under garments on. Her sneakers were soaked with urine.
The children were all hungry. They ate three bowls of pasta according to the foster mother. The children had no table manners and did not know how to use a fork. They grabbed food with their hands and were obsessed with eating. At first, the foster mother allowed them to eat at will, but later she began to limit their eating and snacking and taught them to use table implements.
Sleeping for the children was problematic from the very beginning. They were inconsolable, afraid of the dark, Susana was incontinent, and they screamed virtually all night, afraid of a Spanish ghost.[8] Susana was speech delayed, she threw her shoes and refused to stay in her bedroom at night. The foster mother said it took six months before they all slept through the night. The children's other behavior was equally troubling and exacerbated after visits with the children's mother, Emily.
Emily had admitted to social workers and counselors that Michael would swear at her, that Susana would bolt out of the house from time to time, and that she struggled dealing with Jose's numerous physical treatments. Emily testified that she thought she was close to Susana ". . . but she is real different from the boys. She didn't get close to me." She testified she only had a real good relationship with Michael.
These problems were magnified when the children first went into foster care. The foster mother was able to do the most for Jose. He was the youngest and least corrupted by the years of neglect. He was also the physically neediest due to his biliary atresia. His gains physically and emotionally were early and remarkable. The pediatrician at Yale could not say enough about the quality of his care, his physical improvement and his emotional gains in foster care. The foster parents took a six CT Page 11156 week course to learn cardio-pulmonary resuscitation and to care for a medically fragile child. The other two children, Michael and Susana, who had been with their natural parents for a longer period of their young lives were more emotionally and behaviorally impaired. Michael would say things like "Bitch, get that!" He was abusive to his siblings. His conduct was difficult and disordered. Susana was worse. She would run out of the house for no apparent reason. She would continually masturbate herself, putting such things as dolls in her vagina. She would do it in front of her foster parents, in the stores, in her room, anywhere and everywhere. There was no particular pattern to her masturbation. The foster mother said it was difficult to talk to her because you thought she was comprehending but she wasn't. She would throw her food off the table. The foster parents were patient and consistent. The child worked with a counselor at Child Guidance clinic. Gains would be made only to be off set by regressive behavior following visitation with their mother.
After many months the foster mother reported that Susana started to fit in better. She felt safe; she stopped wetting the bed, she stopped masturbating, she would climb on the foster mother's lap when they watched TV; she overcame her fear of men and became comfortable with the foster father.
As a consequence of Emily's arrest in Connecticut for risk of injury to her children, the Pennsylvania authorities found out about her arrest and sought her extradition to Pennsylvania. She was extradited in late 1996. On January 29, 1997, Emily was sentenced as a fugitive to four months to two years in prison. She served at Cambridge, Pennsylvania for eight months until July 20, 1997. She was released and is presently on parole until the year 2000. Jorge was also extradited to Pennsylvania and was tried for the drug charge and for being a fugitive. Jorge admits in his telephonic testimony that his present sentence is for conviction of the crime of intent to deliver drugs.
At the same time Emily was extradited, DCF had an Interstate Compact home study done on Emily's mother's home in Pennsylvania since her mother was willing to undertake the care of Michael and Susana. On February 24, 1997 the two older, healthier children were sent to live with their maternal grandmother, Beverly, and her male companion of nine years, Ira. Both came to Connecticut for this trial and testified.
Beverly and Ira independently testified that the children CT Page 11157 behaved within normal limits for children of their respective ages. There was no bed-wetting, no masturbating, no bolting from the house, no nightmares and no unusual behavior. Beverly would take the children once a week to visit their mother, Emily, in jail. Beverly told the children she was their grandmother and wished to be called that. Beverly testified that the children did not view Emily as their mother, they viewed her as "Emily." Emily was released from prison on August 8, 1997.
Upon her release, Emily went back to live with her mother and Ira and the two children. After approximately two weeks, Beverly gave her daughter permission to go out and have some time to herself. Emily went out for the night and didn't return until the next day. For reasons known only to Beverly and Emily, the children's maternal grandmother, Beverly, became ". . . very furious. We had words, the next thing you know, I felt like I was going to punish her (Emily) by sending the kids back. But I punished myself and I punished those children. I didn't realize there would be this many problems."
Beverly did send the children back to Connecticut. The DCF officials responded to the Pennsylvania child protection agency's telephone calls that the placement had gone bad. A DCF worker went to Pennsylvania to pick up the children. The children had been shuffled one too many times. The maternal grandmother could not have imagined the devastation it would cause to these two children. In psychiatric terms, they seriously decompensated.
The children who had lived in Pennsylvania, Puerto Rico and multiple locations in Connecticut with their very inadequate parents, went to foster care for a year, went to their maternal grandmother's for six months and were then returned to foster care. One witness called their reaction an attachment disorder. Susana completely regressed to her earlier primitive behaviors. She ran away, wet her bed, she was fearful, insecure and resumed masturbating. Her conduct was disordered for as much as six hours a day. Her foster mother tried to resume her patient, supportive and structured care. She got Susana in individual treatment. Gradually, patiently over seven months, again Susana improved. But only until April 22, 1998, when Emily was permitted to talk to Michael and Susana on the telephone, long distance from Pennsylvania to the Connecticut DCF office.
The foster mother reported, and the child's therapist confirmed, that after the telephone "visit" with Emily on April CT Page 11158 22, 1998, Susana "went haywire." She began running away four or five times a day. She would sit on the ground eating rocks. She would "go crazy," biting, kicking, stripping her clothes off, and mostly just masturbating, according to the foster mother. She would blow her nose in her hand and wipe it over things, she was destructive to furniture, she told the foster mother that "Emily was coming to get her." She was "massively non-compliant." Since May, 1998 Susana has been in two different psychiatric institutions, Hallbrook and the DCF children's psychiatric hospital at Riverview. Her individual therapist says that she meets all the diagnostic criteria for autism.
Michael has been placed in another foster home. He does not have contact with his siblings for treatment purposes. He needs the space and time to allow him to bond in his present foster care environment. He has slowly abated his temper tantrums. He has been diagnosed with post traumatic stress disorder. (Exhibit B.)
Jose remains with his caring and supportive foster family where he was initially placed. His pediatrician and hepatologist, Dr. Karpen, reports that Jose's intellectual, cognitive and emotional development has "truly blossomed in this new household." He sees comfortable parent-child and family interaction. Jose's liver condition continues to worsen despite excellent physical and medical care. The foster mother reports that he is high on the list for a liver transplant. He is susceptible to life-threatening gastrointestinal bleeding and life-threatening bacterial infections. Jose gets serious infections of the liver causing him to have high temperatures and frequent hospitalizations. The foster mother works with visiting nurses once a week and daily when Jose is sick. His condition sometimes manifests itself when he vomits large quantities of blood and clots which, according to Dr. Karpen, comes from engorged blood vessels secondary to fever. The internal bleeding also produces very bad bloody bowel movements. Jose requires specialty therapies to reduce the chance of bleeding. As of August, 1999, Jose is still on a waiting list for a liver transplant due to bleeding in to his stomach and esophagus. The foster parents would like to adopt Jose. Jose's physician and this court are both grateful to the foster parents for" the way these parents can open their hearts and open their house" to this child. (Exhibit # 5 p. 2) The two other children are now in individual pre-adoptive therapeutic foster homes. CT Page 11159
The male biological parent, Jorge.
Jorge's testimony was unconvincing and inconsistent. His principal claims relate, not to disputing the allegations of profound medical, educational and physical neglect, but rather to the lack of contact with the children over the past three years. This he relates to not having the children's address in the foster homes. This is inconsistent for two reasons. First, he admits to having received papers, letters, "cartas" from ". . . either DCF or the court." From his description of the papers it is clear to the court that he was receiving the DCF treatment plans that regularly occurred every six months. He said he had a friend who was able to read them and translate them for him. All of those documents had the address of DCF where he could send cards or letters to his children. Second, at all times during these proceedings he has had court appointed counsel who could have communicated with his children. In addition, for a period of time during these proceedings while Jorge was in prison in Pennsylvania, two of the children were living with Emily's parents in Erie, Pennsylvania. Jorge said he knew that. His failure to communicate with his children was not the fault of DCF. His inability to be physically available to parent his children is because of the choices he has made to engage in unlawful conduct resulting in his incarceration.
The court accepts his representation that while this action for termination of parental rights has been filed, he wrote three or four letters or cards to his children. This amounts to one letter a year, if the children indeed did receive them. This hardly constitutes active parenting or maintaining a sufficient interest in them.
He also said he never refused any program that was offered to him nor did he ever test positive for drugs while in Connecticut. This too, is incorrect. In petitioner's exhibit # 8, a "Psychosocial Evaluation and Assessment," performed on May 17, 1996, three months after the children were finally removed by DCF, Jorge told the counselor that "[H]e claims to have drank alcohol daily during the past year until his children were taken into DCF custody. He admits his pattern of drinking was problematic and it interfered with his ability to parent appropriately . . . Mr. L. first snorted cocaine one year ago. He was using cocaine daily, but denies any use in the past week." The counselor took a urine test. Jorge tested positive for the presence of cocaine on May 17, 1996. CT Page 11160
Jorge concedes on cross examination that the children would probably not know him at this time and that he did not initially tell DCF that he had family members that might be available to care for the children. In sum, he did not offer family members as placement resources, he continued to use drugs well before and after the children were removed, he has failed to actively involve himself in the children's lifes and now bemoans his status as a failure of DCF to provide him with the children's foster care addresses.
Some of the obligations of parenthood can be pursued, even from prison. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child;. . . . and (5) the duty to furnish social and religious guidance." In reJuvenile Appeal (Docket 9489), 183 Conn. 11, 15, 438 A.2d 801
(1981) quoting In re Adoption of Webb, 14 Wash. App. 651, 657,544 P.2d 130 (1975). This court finds that the father took no meaningful action to maintain a relationship with his children; he did not seek to visit them; he did not communicate with them; he did not provide guidance; he did not express concern. His efforts which did occur were late and ineffectual as far as his relationship with his children is concerned.
The court is mindful of the many courses he claims to have completed while incarcerated.(Fathers Exhibits A 1 — 14) Those courses, hopefully, will lead to his personal rehabilitation. They have not impacted upon his failure to communicate or relate to these three children. They have not demonstrated any improvement in his parenting skills. The children have no relationship with him, nor he with them. "The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with one's children." In Re Shannon
S., 41 Conn. Sup. 145, 153, 562 A.2d 79 (1989). The court finds that the father has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; General Statutes Sec. 17a-112(c)(3)(D). CT Page 11161
Further, the court finds that while the children were living in the home of origin, Jorge was available to care for, protect and nurture his children. He did not do so and on January 10, 1997, the children were adjudicated neglected in that they had been denied proper care and attention physically, educationally or morally. The court further found that the children had been permitted to live under conditions, circumstances or associations injurious to their well being. His self disclosed history of leaving school prior to completing the ninth grade, excessive use of alcohol from age fifteen, his fugitive status, his use of cocaine, his arrest and conviction for intent to sell illegal substances, and his failure to complete any treatment programs and successfully remain substance free while not incarcerated; all support the position of DCF that Jorge has been a parental failure. The court does not find this as the father's fault, as this would be inappropriate. In Re David L. 54 Conn. App. 185
(1999) It is necessary, however to establish a baseline from which his rehabilitation as a parent may be made. This is made more difficult when the parent did not have a "former constructive and useful — role as a parent." In re Migdalia M.6 Conn. App. 194, 203, 504 A.2d 532 (1986). The court must further analyze the parent's rehabilitative status as it relates to the needs and age of the children, and determine whether that parental restoration, if possible at all, will occur within a reasonable time. G.S. § 17-112(b)(2) In re Luis C, 210 Conn. 157,167; In re Joshua Z. 26 Conn. 58, 64 (1991) cert. denied221 Conn. 901 (1992).
His present claims of program completion while incarcerated do not inspire confidence that ". . . within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. General Statutes 17a-112(c)(3)(B). The children have not been in his care in more than three years and at the earliest possible time he will not be released for another two or three years. Even upon his release he will not be instantly available to parent. He will need time to re-establish himself and to conduct his affairs over time before any court could possibly have confidence in his recovery from substance abuse. This would require the children to remain in temporary foster care for many years. This is an unacceptable prospect for the children.
The court concludes that the children have previously been adjudicated neglected and the father has failed to achieve such degree of personal rehabilitation as would encourage the belief CT Page 11162 that within a reasonable time considering the age and needs of the children, such parent could assume a responsible position in the life of these children.
 Adjudication
With respect to the statutory grounds for termination of parental rights of the father, Jorge Hiram L., the court finds by clear and convincing evidence that these children have previously been adjudicated neglected (McLachlan, J.) and the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, he could assume a responsible position in the lives of the children. General Statutes17a-112(c)(3)(B) and that that the father has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; General Statutes Sec. 17a-112(c)(3)(D). These grounds have existed for more than one year.
Mandatory Findings:
The court makes the following factual findings required by17a-112(e):
(1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent. Appropriate and timely services were provided by the Department of Children and Families to the principal custodial parent the mother, including parent training, substance abuse counseling and treatment and individual counseling, transportation assistance, and visitation coordination. (See in particular Treatment plans, exhibit 21 and the social study Exhibit # 22 p. 8). The respondent father was unavailable for DCF to offer services. Within four months of the children's removal Jorge was in jail awaiting extradition. He was only available, if at all, from the removal of the children in February until his arrest in August, 1996.
(2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal CT Page 11163 Adoption Assistance and Child Welfare Act of 1980, as amended.[9] The court finds by clear and convincing evidence that the Department of Children and Families has attempted to comply with federal law. DCF made reasonable efforts to initially keep the family intact and later to reunify the family, given the situation and circumstances, as far as possible. Many services were provided to Jorge and the family prior to removal of the children and services were offered following removal including Family Preservation, Waterbury Youth Services, Family Ties, Morris Foundation, Connecticut Counseling, and Healthy Choices. If there has been any failure to comply with federal law with respect to observing the federal guidelines for permanency planning, the problem is with interstate cooperation. The resolution to this problem may require a federal response. In the present case, this resultant delay did not adversely effect the respondent-father, but did delay the permanency of the children's placement.
(3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order. The Department, with the approval of the court, set reasonable and realistic expectations in order to reunify the family. While only the children's mother signed the `expectations,' it was the respondent's non-involvement in the case which precluded his personal `expectations' from being prepared. The failure of the respondent to involve himself in this process or of the court to ". . . articulate expectations or convey them to the respondent, however, does not in and of itself preclude a finding of failure to rehabilitate." In re Michael M.,29 Conn. App. 112, 125 (1992). The statute requires that the parent make progress in parental rehabilitation.
These children have pervasive specialized needs which require better than average parenting skills. Jorge has only demonstrated extremely substandard parenting skills. His completion of courses in prison may be an attempt to make personal rehabilitation a prospect on his release. The courses he has taken in prison are on the most elementary level. Half of the awards he received in prison were "Specific Skills Reading Awards." They were for progress or successful completion of picture books. Nothing in his history generates confidence that he will be successful inparental rehabilitation. In Re Christina V. 38 Conn. App. 214, 224
(1995) Due to his personal early childhood and adolescent deficits, his lack of formal education and present physical CT Page 11164 condition, his prospect for being able to successfully meet his own personal needs upon his release appears guarded. In any event the children cannot wait years to determine Jorge's future suitability to parent. His past performance as a parent does not indicate that he is highly motivated in that regard.
(4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties. The court finds that Jose has strong emotional ties with his foster family who has provided the physical, emotional, medical and educational support he needs. Jose has no positive emotional ties to the biological parents. Michael is beginning to bond in foster care. Susana is deeply disturbed. Her relationship with her female biological parent is the source of a great deal of Susana's problems according to her counselor. Contact with the biological parents would be extremely detrimental to these children.
(5) Finding regarding the age of the children. Michael is 8. Susana is seven. Jose is five years of age. They have been in foster care for much of their lives. They deserve a permanent, structured, stable, caring, nurturing environment that the foster parents are willing to permanently provide. The respondent is not able to provide, nor has offered the children a plan for a secure home at this time nor in the reasonably foreseeable future.
(6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
The extent of Jorge's contact with the children has been addressed earlier. He has had no contact with the foster parents. If he did mail anything to the children it was a token gesture not rising to the level of meaningful contact. The father's incarceration has provided him with structure and an opportunity to take self-improvement courses. His motivation to complete these courses may be a personal drive to improve his CT Page 11165 circumstances or it may be a personal drive to build a record for early release. The outcome of these courses upon his conduct and future is unknown. Giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C., above at 157; In re Juvenile Appeal183 Conn. 11, 15 (1981).
(7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
The Department initially attempted to encourage contact and promoted visitation between the parents and their children. Jorge was offered weekiy visitation. Jorge was unable to sustain the regular visitation schedule. His incarceration has been a barrier to his maintaining a relationship. No unreasonable conduct by the state child protection agency is noted. The father did not request regular visitation even while in prison in Connecticut.
 DISPOSITION
The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the children's best interest to terminate the parental rights of Jorge L. at this time. This best interest finding is made after considering the children's sense of time, their need for a secure and permanent environment, the relationship that the children have with their foster parents, and the totality of circumstances that the termination of maternal rights is in the children's best interest. In reJuvenile Appeal (Anonymous) 177 Conn. 648, 667-68 (1979). See generally, J. Goldstein, A. Freud A. Solnit, Beyond the BestInterests of the Child 99 (1979).
 Order
It is accordingly, ORDERED that the parental rights of Jorge Hiram L. as to the three children Michael, Susana and Jose are hereby terminated. It is further ordered that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. If the foster parents are CT Page 11166 willing to adopt, it is the court's direction that they receive first consideration. The commissioner shall file with this court, no later than 90 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law. Judgment may enter accordingly.
Francis J. Foley, Presiding Judge Child Protection Session August 11, 1999
[2] His earliest release date is October, 2002 and his maximum release date is April 25, 2011, according to Richard Hamor, his Pennsylvania corrections counselor.
[3] Applying the due process rights balancing test of Mathewsvs Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893 (1976), the Connecticut Supreme Court approved the telephone conference as appropriate when balanced against the child's need to have a permanent nurturing and safe environment. The court found California, Nevada and North Dakota cases in accord.
[4] She admitted to a substance abuse counselor that she used alcohol, became drunk and passed out while she was two months pregnant with Jose.(Exhibit # 10).
[5] Intellectually Emily has an average IQ. Her functional limitations are likely the result of her poor reading abilities and lack of formal academic training. (Petitioner's Exhibit # 19).
[6] Michael had meningitis, Susana had asthma and Jose had biliary atresia, all diagnosed within the first two months of life.
[7] It is unknown if he is still collecting social security while in prison. He does not provide any of his own social security for the support of these children. It is unknown for how many dependents he is being paid.
[8] From the description of the non-Hispanic foster mother it is likely that the children were saying something like `El cuko te coje,' from a Puerto Rican idiom, loosely "The ghost is going to catch you." Ironically, a seminal work on the horrible effect of abuse and neglect on children is called Ghosts from theCT Page 11167Nursery, Tracing the Roots of Violence, Karr-Morse and Wiley, The Atlantic Monthly Press, New York (1997).
[9] This 1980 federal legislation did not meet its objectives of reducing the time children spent in foster, i.e. to prevent "foster care drift." Congress intended that Pub.L. 96-272 [the Adoption and Child Welfare Act of 1980] would mitigate the need for the placement of children into foster care and encourage greater efforts by State agencies to find permanent homes for children — either by making it possible for them to return to their own families or by placing them in adoptive homes. The goals of Pub.L. 96-272 have not yet been fully realized, however, as evidenced by continued increases in the numbers of children entering foster care, increasing lengths of stay in care, and growing concerns about the safety, permanency and well-being of children served by public agencies. Department of Health and Human Services, Administration for Children and Families, [Proposed Rules] Federal Register: September 18, 1998 Vol. 63 No. 181 p. 6. The proposed rules relate to the implementation of the Adoption and Safe Families Act of 1997, 42 U.S. Code 671 et seq., which requires State's to implement procedures for the permanent placement of children in foster care within twelve months of placement. This act has largely replaced the 1980 act referred to in our statute § 17-112(e)(2).